Zoning Board, Case Number 25-2191. Thank you. Good morning. Good morning, Your Honors. May it please the Court, Roman Storzer, Storzer and Associates, for all plaintiffs' appellees, a representative which is in the courtroom with us today, Yehuda Miller. I'm so sorry. I'm having a hard time hearing you. Can you make sure you're closer to the mic? Sorry, Your Honor. Thank you. I'd like to start off by saying that this case is not about refusing to apply for a permit or a variance. This was a fully approved, shovel-ready development that the town blocked because its officials and its residents— Was it really fully approved? Where is the piece of paper that said that they were planning—that your client was planning to build a golf course or a wellness site or any of the other high-end amenities? The approval was a phased approval. There were a number of phases in this development. The first phase had received site plan approval and was completely ready to go. It was only ready for—waiting for ministerial building permits, the first of which had actually been granted by the town, and the home was constructed. So there were many amenities and stuff that were going to be built in later phases, which was always conceived in the approvals. Where is the piece of paper—I was having a hard time finding it in the record, and I apologize if it's obvious—that said that you were still planning a 16-courts golf course and driving range, a wellness spa, any of the other kind of what some people would call high-end amenities? Where's the record site for that? The—I'm—there was no—there is no evidence that our clients were not planning on building those. There was no additional statement. It was approved for all the amenities and so on, and our clients had completely intended to build all of these amenities. But you just answered—you just answered that question. It's—the allegation was made, paragraph 279, appendix page 79. Page 79. Okay, I'll take a look at that in a minute. And I'm trying to figure out how much this is a question of pleading. Like, do we need to look outside the four corners of the complaint based on evidence from the—the, you know, evidence from the lawyer where the lawyer was talking about something that made no mention of the sites and those kinds of things? Like, do you think that this is effectively, like, a pleading issue, or is this a ripeness issue? What do you think is—I think you're going to tell me you think this is a discrimination issue and that we don't need to bother ourselves with issues of pleading and ripeness. Is that right? Or correct me if I'm wrong. Well, I think—I think, Your Honor, is exactly on the right track here, which is certainly enough was pled in the complaint, in the amended complaint, to state real claims here. The issue of ripeness was raised by the defendants here. When we're dealing with issues of subject matter jurisdiction, of course, the court can look beyond the pleadings themselves. But this is not an issue of subject matter jurisdiction, and that's a key point here. This is a prudential issue. The issue of Williamson County says, well, even if you have standing under Article III, sometimes, in some cases, we're not going to let you go forward because we believe that you should exhaust, more or less, certain remedies that are available to you. And that's the crux of our case here. When you're dealing with the Fair Housing Act, there are no such limitations. The Fair Housing Act says, as the Supreme Court has confirmed, that it gives you standing to the extent of Article III. There are no prudential limitations. This Court recognized that in their rule. So here there's a difference between prudential or standing and prudential ripeness, right? No. So there's no difference in your view? There is no difference. Ripeness is simply part of the first element of standing under the Lujan elements, whether there is an injury in fact. The question is a temporal one. If it's not ripe, that means that the injury hasn't happened yet. And this Court has said that. It has said in the National Organization for Marriage case that they are one and the same thing. It's simply part of the first element. To say that, to call it a different name doesn't take it outside of the— I'm too familiar with BMG. Very familiar, Your Honor. Too familiar with it, which suggests or says or holds, and those are three different things, that prudential principles of prudential ripeness do apply to FHA claims. Well, the Court— Tell me how I could distinguish that. Respectfully, I don't believe that the Court analyzed this specific issue. It's sort of assumed that— There are many things that we don't analyze that are still holdings. So tell me, just help me. Help me avoid BMG, and maybe I'll be with you. Well, there are a number of ways we can avoid it. First of all, BMG, there was no question that what they, what the plaintiff intended to build was not what was approved. Here, under the allegations of the complaint, and we have a significant basis to demonstrate that all our clients want to build is what was approved. Now, that is only a small part of this case. So it's your position that there was no, there were no material differences between the initial double diamond application and your client's application? Absolutely not. Absolutely not. I'm sorry, I'm just going to jump in on this because this is all related to the same thing. I must have misheard you because I'm looking at A-79 and A-279, and there's no way that somebody could say that that was a presentation of, that has any evidence about the amenities. Is there another site you want to give me, or did I mishear the record site? Because I thought I heard 279, but I checked 79 just in case, and that's not either. It's paragraph 279. Paragraph 279. Page A-79. Paragraph 279 in? On page A-79. So the developer plaintiff's representative confirmed that they would build the golf course to which the town clerk responded that she had never seen a citizen play golf. Yes. And now I believe I lost the question, Your Honor. Let me help you out. Let me give you another one. Why is it you think you were excused from applying for a variance? There is no debate that a variance is not available. I don't believe that the town is even taking the position that a variance is available. Only the town board could theoretically approve something, which they cannot do now because the town board repealed the law under which they could do that, and they repealed it on the basis of their anti-Semitic animus. The town itself admitted that when they repealed the PDD law, that that would prevent any amendment of the PDD. So there is nothing available. That gets to futility, Your Honor, which I don't think we even need to get to. But if the Fair Housing Act required prudential rightness, and if we were applying for something else, and if all of the other injuries that were sustained here, including, most importantly, the fact that the difference between this case and BMG is that in BMG, they were trying to build something that they were not approved for. In this case, the town board, after the ZBA decision, after the ZBA said you can still build what was approved, the town board said, uh-uh, no, you can't even build what's approved anymore. We're taking that away from you as well. So that is a clear and fundamental distinction between the two cases. But assuming that none of those facts even exist, applying for it would be futile, Your Honor. Let me ask you a couple of questions. So on dignitary injury, what precise dignitary harm did your clients experience, independent of the challenge land use decisions? Your Honor, there is an entire litany of harms. There are all of the mistreatments. There's the manipulations of the process. Are those independent of the land use decisions that you're challenging? Yes. There are several actions that were independent of the ZBA's decision. And certainly, most importantly, there is the town board's action on top of that, which, irrespective of what the ZBA did, said you're not allowed to build anything else. Then the town board said we're going to increase your fees 1,000 percent. They're going to take money, pass a new escrow law, making our clients pay for their litigation counsel that they used to strategize. And how am I supposed to determine that those are independent of the land use decisions as a matter of proving a dignitary injury or harm? Well, the, for example, the illegal assessments of the properties, that has nothing to do with the ZBA decision. They over-assessed the properties, which the New York State courts found was illegal, on the basis of their anti-Semitic animus. They, you know, the authorizations to accept donations by local residents specifically to target this group, the reopening of the secret process, telling New York State agencies, county agencies, don't process any more of their permits because we don't want them here. Let me ask you about futility because you mentioned something in connection or in answer to Judge Parker's question. And you said they didn't, there was, a variance is not available here, right? Yes. So how do you explain the fact that the town board invited your clients to submit proposed changes to the town board in its 2023 resolution? Well, that's part of the process, Your Honor. They wanted to manipulate the process to delay them to do whatever they could. Why isn't that evidence or some suggestion that a variance is available? Well, let's speak technically here. It would not be a variance. It would be an amendment to the PDD, and that makes a difference. One is a variance, which was at issue in BMG. That is, you're not allowed to do this under the law. The law provides you with a mechanism to seek variances. Here they cannot get a variance, and I believe that the town itself will agree that we cannot obtain a variance. The town will argue that we could obtain an amendment to the PDD, but that itself is not supported by the record. The town has said that the repeal of the PDD law, which would allow normally a PDD amendment, itself now does not allow it because that law was repealed. There is no law that would permit the PDD from being amended. Okay. I've got two more quick questions as to the state law dismissal. Your Honor, I just have one more point, if I may. We have the point person for the Lost Lake Project from the town saying if they were to try to change the zoning, they would fail. I mean, that is, if there ever was a situation where the- It's the facto futility is what you're- Dug in your heels, futility. We have the two kinds of futility. Both exist here. On the state law dismissal, why can't we interpret the district court as dismissing the state law claims for lack of supplemental jurisdiction? Well, we don't know because the district court didn't explain itself. Yeah, but why can't we just interpret it? We can affirm on any basis. Because the state law claims are not land use claims in the sense that Williamson County applies to. They are the interference with prospective business advantage, which doesn't have anything to do with Williamson County. It's the Article 78 action, which was at issue in BMG. That was the action that was brought in state court that the federal courts relied on there. We brought that claim in this action as part of the federal court's supplemental jurisdiction. And without discussion and without analysis, we were denied even the right to appeal the ZBA's decision, which New York law gives us the right to do. The court did not even dismiss it based on its discretion. Will you reserve some time for rebuttal? Thank you, Your Honors. From the council of the town of Morrisburg, Sony Board. Sony Board of Appeals. Is that full time? Good morning, Your Honors. May it please the court. Leo Dorfman from Sokoloff Stern, LLP. Here on behalf of the town of Forestburg and the other appellant respondents, the rightness question, as this court has reaffirmed again and again, is a very, very narrow one. Is the decision a final decision? And that rests on whether there's an avenue that remains for the municipal body to clarify or change its position. Well, Mr. Thomas just said that because of the changes in the law regarding the town board, there was no vehicle for obtaining variances. That is incorrect, Your Honor. The town board maintains the authority to modify or change the approvals as necessary. The tweet, excuse me. So what do you do in this case, though, when they say that they're being consistent? So like, yeah. So like when you answer his question, put that wrinkle on it. I'm sorry? Answer Judge Parker's question and then tell me how that applies in a situation where they're claiming that they're consistent. But answer Judge Parker's question first, please. Okay. In answer to your question, Your Honor, the local law of 2020 expressly says that it, quote, shall have no effect on approvals previously granted. And the town board, as a legislative body, has plenary authority to legislate on this issue. The town board issued a resolution specifically inviting the applicant to come and apply. And they haven't done that. And, Your Honor, your question about – I'm sorry. What was your question? Well, they're arguing that they don't need to seek any of this because they're consistent. So where do they go now? I think what's different between this case and some other cases, it's similar with one but two of the others, is that one body does both the variances and appeals and does the approval. In this case, it's bifurcated. And so the question is do they have to go through one shoot, reach the top of the line, and then go through another shoot and then hope that you don't create a third shoot for them to go through? At what point can we say it's final enough? That's when they've exhausted that – when they've exhausted every shoot is the answer. So you would keep creating hoops for them to – okay. So tell me why not, though, because many of the cases, not all of them, but at least two of the big cases assume that what you have broken up into two bodies is done within one body. And so now how do we deal with an endless number of hoops that you're defeating? How could they ever be right if you think that you have the ability to keep creating hoops? I'm not sure which cases specifically you're referring to, Your Honor. But in BMG Monroe, which I stood right here three years ago arguing that case, there was the ZBA – there was the building permit decision, the ZBA decision. And then there was a body specifically with authority to modify the approvals. With authority, right? It was all in one. That was – it wasn't all in one, Judge. It was the building inspector, the ZBA reviewing the building inspector, and then there was the planning board that had the authority under the governing legislation to modify the approvals that were in place. Here it's the building inspector, the zoning board, and instead of the planning board, we have the town board with the legislative authority to modify the approvals that are in place. It's the exact same situation. It's just a different body. Now, there's – no one is saying that there's a step after that. There's no legislation suggesting that. I don't think even the plaintiffs really are arguing that here. They're saying that the town is claiming that you can go to the town board, but you really can't. And what we're saying is just take yes for an answer. The legislation explicitly says you can come to us for a modification. The resolution specifically says come to us for a modification. The lights are on. The doors are open. There's an engraved invitation. They just have to walk through it. This Court said in BMG Monroe, you have an invitation. You've got to walk through the door. That's exactly what we're saying here. And, Judge, to address your earlier question, because I think it's important, they're saying, well – This is my question? No. Your Honor's question. May I address a question for you first? No, no, no, no. Address your earlier question. The earlier question was, well, they're saying that their project isn't different, that there are no – that they don't need modifications. Well, that's exactly what the plaintiffs were saying in BMG Monroe. And it's – and this Court says you still have to go. It's a common feature of these cases. I mean, the developers always come to this Court saying we didn't have to go through that last step or that last step, the town was wrong or the village was wrong, and we shouldn't have to go through the next step. And this Court says again and again, even if you think that the last step was wrong, you still have to go to the next step because rightness doesn't look at the merits. Rightness doesn't look at the substance. Rightness just looks at what avenues are still available. And here I've just sort of reiterated what avenue is available. Let me ask you this. What are we to make of the odor or the stench of anti-Semitism that pervades this particular piece of litigation? Judge, if there is an odor or a stench of anti-Semitism, which of course the town denies, that will – I mean, some of the e-mails, I mean, are wrong to say that conservatively. Judge, I – there will be a time and a place where I'll have to stand up potentially to defend the e-mails and put them in context. Why don't you start here? I would say, Judge, there is a context to the e-mails, but it has nothing to do with the question that's before this body here today. This isn't about whether the plaintiffs will have their day in court to address those allegations. This is about when the plaintiffs will have their day in court to address those allegations. Let me ask you because there are some, I think, fundamental issues that are raised in this case about rightness and so on. And you heard my questions to Mr. Storzer related to PMG and whether that applies, whether principles of prudential rightness, however you want to characterize or think about that, can even apply to the FHA. And that's a fundamental question. I'm going to get to that in a second. But is it your view that their claims should be dismissed on constitutional rightness grounds as opposed to prudential rightness grounds? That is our position, Judge, and that rests on this circuit's body of case law up to this point. The circuit said in the Murphy case, in the Sunrise Detox case, that the question is jurisdictional. The court said in the BMG Monroe case that it's not strictly jurisdictional. That's my part. Part of my question is it seems to me that we've retreated from that. Maybe, maybe it's because of subsequent that is subsequent to Murphy, for example, Supreme Court case law that describes it not as if it is a matter of rightness. It's not constitutional. It's prudential. So what are we to make, for example, the Tahoe Regional Planning Agency case? I think the case is that the plaintiff's site are distinguishable because they go to who may sue as opposed to what and whether there's an injury. So when the Supreme Court says that the standing for Fair Housing Act claims is broad, what it's talking about is who may sue, not when they may sue. Here, in the Court's jurisprudence on rightness, in these cases, it's about when a party may sue, when there is an injury occurs, when there is a concrete and particularized injury that this Court can review, and that's a very different question. All right. So if we disagree with you that, well, your claim is that this final decision requirement is actually constitutional, right? Yes. And not prudential. If we disagree with you on that, what's your response to the argument that you can't apply prudential standing concerns to FHA claims? What's your backup argument? My backup argument is this Court's rulings in prior cases. It's this Court's ruling in BMG Monroe. So Mr. Storzo says, I think he's right. I've got my issues with it, but he says, you know, if you look at BMG, it's one line. There's no analysis about why we should view this as, view prudential rightness principles as applying to FHA claims. And it comes out of, in one sense, nowhere, because Village Green maybe, Village Green talks about constitutional rightness. So where is this, what is the analysis that we would employ if BMG had actually analyzed the situation? Why should we apply prudential rightness to FHA claims? Where we, in other contexts, have said, as Mr. Storzo mentioned, that, you know, FHA claims are deeply significant. It's a congressional mandate on an important issue, and I think we can all agree with that. And we said, this Supreme Court has said, that for purposes of rightness, for purposes of standing, for purposes of understanding the scope of the FHA, it's as broad as possible. This Court has applied this jurisdictional or semi-jurisdictional, not strictly jurisdictional, rightness requirement from Williamson to takings claims, to equal protection claims, to ADA claims, to all manner of land-use claims, all of which are very, very important and implicate critical principles and rights that are fundamental. And what I would say is there's very good reason articulated in all the — I'm sorry. This is not about prudential standing. You're really focused on prudential rightness, then. Sure, Judge. I'm focused on Williamson County rightness and how it applies to all of these claims. So you agree that there's a difference between standing, it's not a standing case, it's a prudential rightness case. That's correct, Judge. And what I would say is that there's no reason for this Court to treat — to go against its previous rulings and to treat Fair Housing Act cases differently when — especially when all we're relying on here is dicta that talks about who may sue and not when they may sue. Okay. Let me ask you two more questions, if you'll forgive me. Of course. So how would the pursuit of a further administrative decision further define the injury stemming from discriminatory animus or discriminatory process? What we're looking at here, Judge, is what rightness looks to is the harm. And if what plaintiff is trying to vindicate is the harm caused by the land-use process, what going back to the town board will make concrete is exactly what the harm is. Going back to the town board, asking for a modification, if they don't like what they get, they can come to the court and say, here is how what we got differs from what we ought to have gotten. Right now, they can't say that yet because they haven't asked. So let me ask you, just as a follow-up, and you, in answer to Shabetta's initial questions, you provide an answer, I think, that I want to follow up — press. So, you know, this is the motion that's in this stage. Is that correct? All right. So — and, you know, I was on a panel many, many years ago, it feels like, where there was a semi-judgment stage. Very, very different. And these cases pop up in different stages. But the motion in this stage, as you know, we look at the allegations in the complaint. So, you know, paragraph 279, for example. Aren't we supposed then to, at the motions this stage, credit the representations that the town board lacked the authority to grant a variance? The court at this stage can consider not just what is in the pleading strictly, but also documents referenced in the pleadings, and can take judicial notice of public records that relate to this process. And the court does not have to accept as true allegations that fly in the face of the documents that it's looking at. And under 12b-1, the plaintiff, in this semi-jurisdictional or almost strictly jurisdictional posture, the plaintiffs have the burden of showing that they meet the ripeness requirement. And they can do that by presenting documents that show that. Here, documents that the court can consider show really what is the critical question, whether there's another avenue for relief available. And your response, I think, I understand it, as I understand it, is that this amendment process before the town board is a — qualifies effectively as an avenue for a variance. It does. Well, the court, I think, in its past decisions has used the word variance a little bit loosely. In BMG-Monroe, what the avenue available to the plaintiffs, the developers, was an application to the planning board for a modification. The court in its decision called that an application for a variance, but really it was an application for a modification. Here, same thing, application for a modification. It wouldn't be, strictly speaking, a land-use variance, but it would be a modification of the approvals. Breyer, you say that's a subset of what we're talking about when we refer to variance. It is. And I think in BMG-Monroe, the court even called it a variance or modification. I have one more question. So, assuming that we believe that it is a prudential limitation, and ripeness is a prudential limitation as opposed to a constitutional limitation, would a situation of creating zoning regulations and a requirement of modification in the face of pretext, in the face of discriminatory animus, would that be a justification for exercising our prudential ability to not impose a strict ripeness requirement? It would not be a justification to do that. Explain why. Because the court has looked again and again at similar cases where there were allegations of discrimination, there were allegations of hostility in the process, and the court has said again and again that allegations of discrimination and hostility in the process don't get you around the ripeness requirement.  Thank you. Thank you. I've got so many questions, but if it takes hours, go ahead. I do have a few points I really would like to make, Your Honor. Go ahead. First off, counsel talked about the burden we have under Rule 12 to demonstrate subject matter jurisdiction. I'd like to point out that they had the burden to make a timely motion, which they didn't. They didn't make it under 12b. They didn't make it under 12c. I think we're beyond that. Fair enough. Second of all, we haven't addressed the fact two specific claims, which Williamson County doesn't have anything to say about, is our retaliation claim under the Fair Housing Act, which gives us a right claim as soon as the retaliatory action takes place, which is exactly what the town did as soon as we filed suit, which was our constitutional right to do. And then after that suit was filed, the town took action after action after action attacking the Hasidic community. And two, our facial challenges to those actions. These were legislative actions. And this is a fundamental difference between this case and BMG. At best, BMG might be applicable to our building, the specific building permits that were denied by the ZBA. Then the town went far beyond that. The ZBA said, well, you can still build what you're allowed to build. The town said, no, you can't. You can't build anything now. You can't continue your infrastructure. That house you built already, we won't let you build a road up to it. You can't do anything. BMG says nothing about that situation. In BMG, they kept building houses. In fact, they built the very houses that they had applied for the building permits for. But BMG does say something about the FHA. So what I think you're describing is a form of discrimination, right? Well, it's about what we are challenging here. We are not only challenging the ZBA denials. We are challenging the town's actions, shutting down the project completely. And there has never been a case that has involved such a fact pattern which said, okay, the town board has taken its legislative authority, said your approvals that you had, we're taking them away from you illegally. And you know what? You have to come back to us to try to get them back. And we have the point person saying, and we'll never give them back to you too. So to say that this is the same as BMG. This is a separate issue. I'm sorry. It's not quite I think what you're getting at. But he says that this amendment process is an avenue and that there's a way to read our decisions going back two decades at least, certainly since Murphy, to understand that when we say variance, it's actually a broader term than the technical term that's usually used in land use disputes. It means an avenue to amend, an avenue to reconsider and so on. What is your response to that? To modify. When the town approved the PDD, that was a legislative action. When the town took away those approvals, that also was a legislative action. Now they're saying, well, you have to come back to us and ask us to pass a new law allowing you to be here because you're Hasidic. That is what's happening here. That's what's alleged in the complaint. That is what the evidence supports if the Court's going to look beyond the pleadings. And Williamson County says nothing about such a circumstance. And even at the end, I don't think we have to get here, but the ZBA, which is the body that interprets the town zoning code, in its decision said the project PDD approval remains valid and subject to the repealed PDD laws, but only to the extent that the resort project complies with the limitations set forth in the town code chapter for nonconforming use of structures. What that means is because they repealed the PDD law, the project was still permissible, but it could not be changed anymore. The town admitted that. Robbins said we can't change it anymore. And the reason they did that is because they were afraid that Hasidic Jews would come into the town and try to amend the PDD. There's other evidence saying, well, they would never want to come into our town because they like to pack themselves in like beavers and, you know, so on. But our clients did want to build exactly what was built. The town says, well, you don't want to use them as second homes. There's no evidence in the record that we weren't going to use them as second homes. That's based on absolutely nothing. They said, well, you want Hasidic Jewish families? What are we going to apply for, an amendment saying that Hasidic Jewish families are allowed to live in this development? This is ridiculous. There's not only can they not amend the PDD law anymore, but whatever we would ask for, it would not be permitted by law. To say that developers can't build the homes, New York law is very clear to say you can't limit who is going to build or use property. You can limit what is going to be built, but not who is going to build. Thank you very much. Thank you, Your Honors. Thank you. We'll reserve a decision. Thank you. We'll reserve a decision.